## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## GREENSBORO DIVISION
### Case No. 1:21-cv-867

| | |
|---|---|
| **FAIRWAY OUTDOOR ADVERTISING, LLC** | |
| **Plaintiff,** | |
| **v.** | **COMPLAINT** |
| **CITY OF HIGH POINT,** | |
| **Defendant.** | |

NOW COMES Plaintiff, FAIRWAY OUTDOOR ADVERTISING, LLC, LLC ("Fairway"), by and through its undersigned counsel, complaining of the Defendant City of High Point ("City") pursuant to, *inter* alia, N.C.G.S. §160D-1403.1, N.C.G.S. §143-755, 42 U.S.C. §1983 and 42 U.S.C. §1988, and respectfully alleges and shows unto this Court as follows:

### INTRODUCTION

1.     On May 16, 2016, after conducting a public hearing the City of High Point adopted Ordinance No. 7206/16-26 with an effective date of January 1, 2017 ("Ordinance").  The Ordinance contains specific standards for signs in Section 5.7. The Ordinance is facially unconstitutional because it, among other things, practically bans all signs such as billboards displaying off-premise messages ("Outdoor Advertising Signs" or "Billboards") or imposes numerous onerous and

discriminatory restrictions on them in the City without banning or imposing the same restrictions on other types of signs within the City (such as real estate, political, and various non-commercial signs). Outdoor Advertising Signs display both commercial and noncommercial speech. With the Ordinance, the City imposes disparate treatment on Outdoor Advertising Signs versus other signs because it favors the content of those other signs, and it does so in a manner that is not narrowly tailored to advance a compelling governmental interest. This is a violation of Article 1, § 14 of the North Carolina Constitution, the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171-173, 135 S. Ct. 2218, 2231-32 (2015).

2.      The practical effect of the City's sign regulations, including the Ordinance, is to ban Outdoor Advertising Signs as an effective medium of communication. Moreover, it practically bans such signs displaying real-time messaging by virtue of digital technology, a uniquely valuable or important mode of communication.

3.      As such, Fairway brings several facial constitutional challenges to the City's sign regulations, including its Ordinance. Fairway also (and separately) challenges the manner in which the City has applied its sign regulations, including the Ordinance, to Fairway's property interests as hereinafter set forth.

2

4.     Fairway seeks, among other things, declaratory relief, injunctive relief, and money damages based on the City's deprivation, under color of state law, of rights guaranteed to Fairway in the North Carolina Constitution, the United States Constitution, North Carolina statutes and 42 U.S.C. § 1983.

5.     As set forth more fully below, Fairway applied for several development permits to erect or modify Outdoor Advertising Signs with digital technology within the City's jurisdiction that were denied as a result of prohibitive sign restrictions that are illegal under federal and State law.  Under N.C.G.S. §143-755(a), Fairway is entitled to the issuance of the development permits based on the rules in effect at the time of its permit applications with the illegal provisions stricken or determined to be non-enforceable against Fairway.

## BACKGROUND

6.     On August 16, 2018, Fairway filed its original action against the City in the United States District Court for the Middle District of North Carolina, Case No.: 1:18-CV-711.  ("Fairway" and the "City" are collectively referred to as "Parties").

7.     On September 9, 2019, the Parties jointly stipulated to a dismissal of the original suit without prejudice under Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure so that the City could continue to evaluate changes to its sign regulations that may allow the Parties to resolve their dispute without further Court intervention.  Changes to sign regulations were ultimately not made by the City to

solve the ongoing controversies between the Parties and the City's constitutional violations are a continuing wrong restraining Fairway's freedom of speech and property rights.

8. To accomplish the initial desires of the Parties to allow additional opportunities to amend sign regulations and to preserve the status quo in the meantime, the Parties entered into an initial tolling agreement on September 9, 2020. A true and accurate copy of which is attached hereto and incorporated herein by reference. *See* Ex. A. This tolling agreement tolled any claim or cause of action alleged in the original complaint as of September 9, 2019, with an expiration date of September 9, 2020.

9. Later, the Parties entered into a Tolling Extension Agreement/Amendment to extend the effectiveness of the original tolling agreement up to and including November 9, 2021, a true and accurate copy of which is attached hereto and incorporated herein by reference. *See* Ex. B.

10. State tolling rules are applicable to causes of action filed under 42 U.S.C. §1983. *Board of Regents v. Tomanio*, 446 U.S. 478, 483-486, 100 S.Ct. 1790, 1794-96 (1980); *Johnson v. Railway Express Agency*, 421 U.S. 454, 460-66, 95 S.Ct. 1716, 1720-23 (1975). As a result, this refiled Complaint is timely under applicable law.

## PARTIES, JURISDICTION, AND VENUE

11.     Fairway is a limited liability company formed under the laws of the State of Delaware with local offices in Guilford County, North Carolina.  Fairway is in the business of outdoor advertising, which involves the display of commercial and noncommercial messages on signs, typically referred to as Billboards, for advertisers renting space thereon.

12.     Fairway is authorized to do business in the State of North Carolina and conducts business under the name of Lamar Outdoor Advertising.

13.     Upon information and belief, Defendant City is a municipal,  political subdivision of the State of North Carolina, duly organized and operating pursuant to Chapters 160A and 160D of the North Carolina General Statutes.

14.     Any and all actions taken by the City, as detailed herein, were taken under the color of state law for purposes of 42 U.S.C. §1983. The City's sign regulations, on their face and as applied, injure Fairway's civil rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.  Such injuries arise from or were caused by the City ordinances or otherwise by City policy or custom.  The actions complained of herein are unconstitutional and implement or execute an ordinance, regulation, policy or custom of the City, triggering liability under 42 U.S.C. §1983 and entitling Fairway to declaratory, injunctive and monetary relief.  Los Angeles County, Cal. v. Humphries, 562 U.S. 29, 36, 131 S.Ct. 447, 452

(2010); *Dennis v. Higgins*, 498 U.S. 439, 447, 111 S.Ct. 865, 870 (1991).

15.     This Court has jurisdiction over Plaintiff's constitutional claims and civil rights claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3) and (4).

16.     This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000.00, exclusive of interest and costs. Diversity jurisdiction exists because Plaintiff and Defendant are citizens of different states.

17.     This Court also has jurisdiction pursuant to 28 U.S.C. § 2201 and 2202 to declare the Parties' rights and to grant all further relief found necessary and proper.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because, *inter alia*, Defendant resides in this judicial district and the property in question is located in this judicial district.

19.     Fairway has standing to bring the claims asserted in this Complaint—including but not limited to—claims that the City's sign regulations, including the Ordinance, or sections thereof, are unconstitutional on their face, that the City is applying its sign regulations, or sections thereof, in an unconstitutional or improper manner, and that the City's sign permitting scheme acts as an unlawful prior restraint. Fairway has standing to bring the claims asserted in this Complaint due to the denial of its First Amendment free speech rights under the United States

6

and North Carolina Constitutions, these rights being denied under color of state law by the City of High Point by enforcement of its sign regulations, including the Ordinance, against Fairway. Fairway has sustained injury because of the City's enforcement of its sign regulations, including the Ordinance, and Fairway will continue to sustain injury due to the City's continued enforcement of said regulations against Fairway. Further, Fairway has standing because the enforcement of the City's sign regulations, including the Ordinance, directly and adversely affects Fairway's property interests.

## FAIRWAYS' INTERESTS WITHIN THE CITY AND CITY CONTEXT

20.    At all relevant times, Fairway doing business as Lamar Outdoor Advertising, has been engaged in all aspects of the outdoor advertising business, including but not limited to, the sale/lease of Billboard space, and the securing of real property and property rights (through outright ownership and/or leases of said property) for use as locations for outdoor advertising, both within and outside the City and the State of North Carolina.

21.    Fairway and third parties who wish to convey messages to others through the use of Billboard space enjoy the right to engage in, attempt to engage in, and actually engage in, speech that is protected by Article 1, § 14 of the North Carolina Constitution and the First and Fourteenth Amendments of the United States Constitution, including but not limited to political speech, social speech,

public service speech, other forms of noncommercial speech, and commercial speech, both within and outside the City and the State of North Carolina.

22.    The City is located in the Piedmont Triad region of the State of North Carolina. Most of the City is located in Guilford County, with portions spilling over into neighboring Randolph, Davidson and Forsyth counties.

23.    As of the refiling of this Complaint, the City's corporate limits extend over an area that is more than 55 square miles in size with a population exceeding 100,000 citizens. The City is currently the ninth-largest municipality in North Carolina.

24.    Upon information and belief, the substantial majority of High Point residents live in the northern and eastern areas of the City.

25.    As of the development permit applications as hereinafter set forth, the City regulated signs within the City—including Billboards owned or operated by Fairway—through Section 5.7, Signage, of the City's Ordinance. The Ordinance was effective January 1, 2017. *See* [Ordinance § 5.7, Ex. C]; [*id*. § 10.4, Ex. C] (defining terms).

26.    As of the refiling of this Complaint, Fairway owns approximately forty (40) Outdoor Advertising Signs within the City's zoning jurisdiction, with a total of sixty-eight (68) billboard faces. Fairway has erected these signs on parcels for which it has secured leases.

8

27.     Nearly all of Fairway's existing signs are located in the southwestern part of the City, mainly along streets in old established heavy industrial areas with comparatively low volumes of traffic, except along Business Interstate 85.

28.     According to the City's Ordinance, Outdoor Advertising Signs were only allowed in areas zoned Heavy Industrial (HI).

29.     HI zones are essentially located in the southwest corner of the City.

30.     Over the last two decades, the City has grown in terms of population, density and commercial development to the North and East, and no new areas have been zoned HI or regulations altered to otherwise permit Outdoor Advertising Signs.

31.     According to the City's Ordinance, the intent of the HI district is as follows:

> The HI district is established to accommodate heavy manufacturing, assembly, fabrication, processing, distribution, storage, research and development, and other industrial uses that may be large-scale or otherwise have extensive exterior movement of vehicles, materials, and goods, and greater potential for adverse environmental and visual impacts.

*See* [Ordinance § 3.4.8, Ex. C].

32.     The use of property for Outdoor Advertising Signs is not heavy industrial, nor is it large-scale or involving extensive exterior movement of vehicles, materials and goods.

33.     Due to the property not being zoned HI or due to changes creating more restrictive rules against Outdoor Advertising Signs, most, if not all, of Fairway's

existing signs are nonconforming.

34.     As of the refiling of this Complaint, Fairway owns and possesses leases on seven (7) parcels or locations within the City's jurisdiction within commercial corridors of the City on which it plans to construct or reconstruct new Outdoor Advertising Signs employing digital technology.   Those locations are: (1) 4005 Precision Way; (2) 2500 North Main Street; (3) 1101 Eastchester Drive; (4) 2924 North Main Street; (5) 1528 South Main Street; (6) 3001 North Main Street; and (7) 716 Eastchester Drive (collectively "7 Commercial Parcels").   Memorandum of leases for each of the 7 Commercial Parcels are recorded in the County Registry.

35.     Each of the leases for the 7 Commercial Parcels grants to Fairway the exclusive right to use and possess the leased premises for the erection, maintenance, repair, improvement, replacement and/or rebuilding of an Outdoor Advertising Sign structure.

36.     The 7 Commercial Parcels are located on two main roads in the City: (1) Highway 311B (North Main Street and South Main Street) and (2) NC 68 (Eastchester Drive).

37.     All Seven (7) of the Commercial Parcels are located in close proximity to major road or highway intersections with a predominate mix of commercial uses, being NC 68 (Eastchester Drive) and West Wendover Avenue; NC 68 and North Main Street; and North Main Street and Interstate Highway 74.   In the West

Wendover and NC 68 corridors and North Main Street to South Main Street corridor, there are hundreds of on-premise signs and off-premise directional signs, including several governmental signs which are provided favorable allowances under the Ordinance based on content; such allowances are also not based on tangible secondary effects that differ from Billboards.

38.     Both Highway 311B and NC 68 are major road or highway thoroughfares within the City.

39.     Highway 311B is a north-south connector connecting High Point with the cities of Winston-Salem and Kernersville in Forsyth County to the North and Interstate 85 to the South.  It provides for commuter travel for those people traveling from Forsyth County, from the direction of Interstate 85 and for residents in the northern parts of High Point to local businesses and destinations in High Point, especially the downtown area of the City.

40.     North Main Street, a five-lane highway, currently serves approximately 30,000 daily vehicular trips along its route.

41.     The land use plans for the City designate the adjoining areas of North Main Street along its route as a commercial corridor for the community and regionally.

42.     NC 68 is a major north-south arterial connecting High Point with the city of Thomasville to the south and Interstate 40 and the Piedmont Triad Airport to

the North. It is currently a five-lane highway, serving a mixture of residential and commercial properties. It is one of High Point's most heavily traveled commuter thoroughfares.

43. The land use plans for the City designate NC 68 (Eastchester Drive) as a commercial corridor for the community and regionally. It currently serves more than 50,000 daily vehicular trips North of Highway 311 and more than 40,000 South of Highway 311.

44. According to the latest High Point transportation study prepared in coordination with the North Carolina Department of Transportation, NC 68 (Eastchester Drive) is expected to be upgraded to a six-lane highway by year 2035.

45. NC 68 (Eastchester Drive) within the City limits is designated by the Federal Highway Administration and the State of North Carolina as a federal aid primary route for which, pursuant to the North Carolina Outdoor Advertising Control Act, N.C. Gen. Stat. § 136-126 et seq. ("OACA"), the North Carolina Department of Transportation has jurisdiction over the erection and maintenance of outdoor advertising signs within six hundred and sixty feet (660) of the right-of- way of said highway. N.C. Gen. Stat. § 136-130.

46. As part of the OACA (N.C.G.S. § 136-126 *et seq*.), the North Carolina General Assembly has declared "that outdoor advertising is a legitimate commercial use of private property adjacent to roads and highways." *See* N.C.G.S. §136-127.

47.    Three (3) of the 7 Commercial Parcels are located adjacent to NC 68 (Eastchester Drive) and fall within the scope of the OACA.

48.    All of Fairway's existing billboards were built with (and currently contain) traditional vinyl display faces. Through the use of digital technology, billboard signs are now capable of providing a sequence of messages electronically; however, the City's sign regulations, including the Ordinance, effectively precludes such upgrades.

## OUTDOOR ADVERTISING AND THE DIGITAL REVOLUTION

49.    The outdoor advertising industry traces its origins back to the invention of the printing press, but the "modern industry" started in the 1830's with merchants painting walls, fences or signs to notify passersby that their establishment sold horse blankets, rheumatism pills and other useful items. The first standardized posters appeared in the 19th century. The medium has adapted over time. A critical element of outdoor advertising industry has always been the ability to change copy on each Billboard to reflect what advertising customers are trying to promote. What was once a poster on the side of a building became a freestanding sign. Hand painting on a sign became printed paper pasted on the board. Paper and paste have given way to computer-generated images on vinyl or plastic substrates. Digital technology represents a fairly recent innovation expanding the capacity that a sign may have to

display advertisers' messages while making the industry more operationally efficient.

50.     During the 1970's the industry started using "Trivision" equipment to allow the display of three different ads on the same Billboard by the application of mechanical rotating panels.    During the 1980s, the application of LED digital displays on Billboards began and was a very small niche of product used mostly in sports stadiums.  The application was small since they could only display red and green colors.  Sony's Jumbotron and Mitsubishi's Diamond Vision were early forerunners of the modern digital display. As with most new product introductions, the initial growth of digital displays was quite slow, but now it is the trend.  Like any industry that is growing and evolving, like communications, technological advancement is necessary and critical for the consuming public.

51.     Billboards utilizing digital technology display static messages that resemble standard painted/printed Billboards when viewed.   Digital displays employed by Fairway do not feature animation, flashing or intermittent lights, scrolling, or full-motion video.   These standards are reflected in the billboard national association (OAAA)'s Code of Industry Practices to ensure that commercial and noncommercial messages disseminated on standard-size digital billboards will be static messages and the content shall not include animated, flashing, scrolling, intermittent or full-motion video elements.

52.    Billboards with digital sign faces would be the same or substantially similar size and square footage as Billboards with traditional sign faces that employ vinyl.

53.    Conventional Billboards use images printed on reflective vinyl to present the advertising message to the public. These printed vinyl Billboard faces are very good at reflecting sunlight and are easy to see during the day. At night these same printed vinyls are typically illuminated by a series of metal halide lights. These incandescent lighting fixtures are positioned above or below the Billboard face and provide illumination through an indirect or reflective light.  Digital billboards have their copy generated by thousands of Light Emitting Diodes (LEDs). Unlike a traditional billboard using vinyl, the digital image is generated by varying the electrical current to the LEDs which, when viewed from a distance, creates a message or image.

54.    Fairway operates its digital displays in full compliance with written guidance provided by the United States Department of Transportation as follows:

o    The message hold time would be 8 seconds.

o    The transition time between messages would be nearly instantaneous.

o    The brightness of the display at night would not exceed 0.3-foot candles over ambient when measured from the appropriate distance based on the size of the display.  This would be equivalent to 300 – 350 nits in brightness.

55. The digital display Billboard is most useful for a "call to action" or "real time" type advertising message. These types of advertising messages are trying to get the viewer to do something often within a certain period of time. For example, attend a sporting event or concert, purchase some apparel or general merchandise before a sale ends, or enjoy a discount at a restaurant if you visit by a listed date. The digital display is well suited to these types of ads since the copy can be changed so quickly.

56. With the explosion of the phone industry, the outdoor industry is using digital technology to connect to consumers' mobile devices for real-time reactions to commercial and noncommercial messaging.

57. Examples of real time business that the digital displays are well suited to display include:

o Streaming content from Twitter, Face book, Instagram, or Google plus. Copy is screened for content checks prior to displaying.

o Dynamic content that changes constantly, providing live updates, such as sport scores, countdowns, time and temperature, and news feeds. A common application for this is the current waiting time at hospital emergency rooms or the current jackpot on a popular lottery contest.

o User generated copy that comes from a client's website. An example of this is a McDonald's restaurant ad where comments are posted from their website on a new product promotion.

o Relevant Copy is related to selecting ads based on current conditions around the sign. The most common application is the promotion of food ads based on the time of day, breakfast vs. lunch or dinner. Another application is auto stores switching to promote new tires and windshield wipers when it is raining. Starbucks will promote cold iced

16

drinks when it is hot, but if the temperature changes more than a pre-set amount, they will promote hot drinks.

The list of real time ads for this "call to action" or "real time" option is quite vast with new ideas being generated every month.

58.     Fairway has always strived to participate in the local community where we operate.  As a result, we have been very active securing agreements with multiple agencies that could benefit from the use our digital products. For example:

o     Amber or Missing Child Alerts - Fairway has been a partner with Amber alerts for several years, running hundreds of Amber alerts on our digital displays across the US.  Recently, in the City of Greensboro, by employing digital technology, Fairway was able to assist local authorities in identifying a missing person who happened to be a "Jane Doe" at a local hospital.

o     Weather Alerts informing the community of approaching severe weather.

o     FBI - On April 10, 2017, the Federal Bureau of Investigation ("FBI") provided an update to the Outdoor Advertising Association of America ("OAAA") regarding the capture of fugitive Demeko Wells using digital display Billboards.  The FBI stated the following in its update: "Fugitive Demeko Wells was featured on digital billboards in the Tampa, FL, area. The pressure created by the billboards influenced Wells to turn himself in the day after the billboards were posted. . . . After turning himself in, Wells admitted to the agents that he had seen himself on the billboards. He was arrested on March 23, 2017. The fugitive was charged with the following: Identity theft; access device fraud; and conspiracy. . . . **Due to the current addition of Demeko Wells, 57 fugitives from multiple cities across the country have been apprehended as a direct result of tips received from digital billboards**." (emphasis added). Fairway partners with the FBI in providing digital billboard space at no charge to the FBI on an immediate, and as-requested and as-needed basis,  for messages regarding public safety and wanted fugitives.

- o    FEMA – Fairway actively participates on natural disaster recoveries by providing information when it is most needed. During and after hurricane Sandy hit the east coast, digital display Billboards posted new messages from FEMA every 15 minutes.

- o    Crime Stoppers – Fairway actively cooperates with Crime Stoppers and other non-profit organizations to help find persons of interest.

- o    Gray or Silver Alerts – A growing area of our community involvement has been helping to locate senior citizens who become confused and are being actively searched for by their families.

59.    More traditional Billboards are strong performers for creating a branding message. Fairway has several categories of clients who want to keep their name top of mind, including car manufacturers, beer companies, wireless companies, amusement parks, just released movies, banks, etc.    These more traditional Billboards are also excellent at providing directional information about the location of a restaurant, hotel or other local business near the Billboard. However, employing vinyl is very limiting.  Comparing a copy change between a traditional Billboard with a vinyl face display to a Billboard with a digital face helps illustrate the advantage the digital Billboard provides to customers.  For a more traditional Billboard using vinyl, the following steps are required to change copy:

- o    The client or agency must finalize the content and messages for the advertising image.

- o    After securing a contract price with a printer, the image is electronically transferred to the print shop.

- o    A printing company prepares, schedules and prints this image on a vinyl substrate, adds installation features to the vinyl, packages it and ships it to the installing market(s).

- o The Billboard company either contracts an installation crew or uses their own employees to travel out to the Billboard location, climb the structure and install the image on the printed vinyl. This step can experience many delays as the crew may have to travel many miles or waiting for the proper weather before installing the ads.

- o It is common to remove the old ads when new ones are installed which creates a recycling requirement to dispose of the old ad copies.

- o From start to finish, this process can happen as fast as three days but a week to 10 days is a more typical cycle. In addition, the client is typically charged hundreds of dollars for each of the printed billboard images.

For a Billboard utilizing digital technology, the following steps are required to change copy:

a. The client or agency must finalize the content and messages for the advertising image.

b. The billboard company schedules and transmits the image to the digital display electronically.

c. From start to finish, this process can happen as fast as 15 seconds, but 30 minutes is a more typical cycle. In addition, the client pays nothing for new copy changes.

60. Despite the fact that Billboards utilizing digital technology change copy much more often than Billboards with vinyl displays, they are much safer to operate. More traditional Billboards can only be changed by a crew of people, who are required to climb structures to secure the ad copy to the Billboard face. While the billboard industry is very proficient at properly training climbers, every time a crew goes out to locations, the opportunities for problems increase, including, but not limited to, changing copy in severe weather. On the other hand, digital display

Billboards can be operated from remote locations that do not require a person on site.

61.    Digital business is very important to Fairway and the outdoor advertising trade because it is very important to today's clients seeking to display their messages. Today's consumers of information are accustomed to instant results and feedback on many of the products and services they buy. Digital displays offer the local advertising community an effective media to reach their target audience at a reasonable price with a very flexible advertising vehicle.

62.    United States advertisers spend more than $2.95 billion a year on digital outdoor advertising, representing approximately two in five dollars on outdoor media.

63.    The employment of digital displays on Billboards is simply an evolution in or modernization of equipment in the Billboard industry. By its very nature, it expands the capacity of the advertising sign to show different advertisers or multiple messages. The normal cycle for ads on Fairway digital displays is eight (8) different advertisers or slots. Each advertiser can change their message each time their slot appears on the digital face. Digital displays are necessary to the billboard industry for many reasons. The operational efficiencies and safety issues are critical to the Billboard industry. Digital displays allow the Billboard industry to stay competitive in the ever-evolving world of advertising and communications by,

among other things, mitigating the inventory dilemma described above, allowing for business expansion and keeping the outdoor advertising industry current with customer demands for "real time" messaging, which has contributed to the decline in traditional print media.

64. Because multiple advertisers can be displayed on one sign during a cycle of ads, fewer numbers of Billboards are needed to disseminate the messages.

65. As of the time of the development permit applications referenced below, the City of High Point only allowed Outdoor Advertising Signs or Billboards in areas zoned Heavy Industrial. Heavy Industrial comprises a very small area of the City. Areas zoned Heavy Industrial are not the areas where you find the target audiences for Billboard clients seeking to communicate messages, especially real-time messages.

66. Heavy Industrial areas in the City do not usually have significant amounts of local traffic. Local traffic with the familiarity of local conditions and places is the critical part of real time messaging. Real time messaging, unlike branding, becomes obsolete within a very short cycle of time. Since Heavy Industrial is so concentrated in one small area of the City, there is little, if any, geographical coverage, which is also critical for getting a message out, especially real time messaging. Employing digital technology is very expensive. There is no

reasonable return on an investment in putting Billboards with digital technology in these low local traffic areas.

67.    Since Billboards employing digital technology are permitted by the State along interstates and federal aid primary highways, Fairway has obtained state and local permits  to install such signs in several North Carolina jurisdictions, such as the Cities of Winston-Salem, Greensboro, and Burlington.

68.    Billboards employing digital technology are the only type of sign technology that allow Amber Alerts and other time-sensitive emergency messages to be communicated to the traveling public at a  moment's notice. Therefore, they provide an extremely critical means of First Amendment  communication.

69.    Fairway has tied all of its Billboards with digital technology throughout the country into a  network that allows public safety and informational messages to be shown on the signs at the  push of a button.

70.    An Outdoor Advertising Sign, especially one employing digital technology, is fundamentally different from other means of communication such as newspapers, radio, television and pamphlet distributions in that, among other things, it is specifically directed to those traveling on public streets; it is a relatively inexpensive way to communicate; it is fundamentally more convenient and efficient to display to the targeted audience in terms of time to produce, scope of messaging, and connecting the advertiser to the recipient during the intended life cycle of the

message. Such medium of communication has no practical substitute.

71. With its sign regulations, the City only allows digital technology on signs that are an accessory to an ongoing business on-site, which grossly favors one type of speaker and form of communication over others and practically bans such use for off-premises messaging.

## FAIRWAY'S REQUESTS TO THE CITY TO ADDRESS ITS REGULATORY BIAS AGAINST BILLBOARDS

72. In 2012, Fairway representatives requested that the City re-examine its zoning laws and sign restrictions due to the fact that the City's existing laws substantially diminished or eliminated altogether the quantity and accessibility of the lawful speech displayed on Outdoor Advertising Signs, especially ones with digital technology. Since the City has substantially grown North and East, and major traffic corridors like North Main Street and NC 68 are located there, where the consumers of outdoor advertising travel, Fairway requested a loosening of what was effectively a ban, so as to permit a fuller opportunity to reach the target audience.

73. After that request, the City's planning staff researched multiple communities across the county, finding that many control, rather than ban, Billboards by allowing them along high traffic corridors and establishing additional controls on height, size and separation from other such signs. According to the staff's research, many jurisdictions have recently adopted a cap and replacement method, whereby the total number of Billboards is locked in while allowing existing Billboards to be

23

replaced with more modern ones, including those with digital technology.

74.    Despite the planning staff's research showing the allowances in other similarly situated jurisdictions and the uncontroverted evidence of the lack of ample or reasonable alternatives for Fairway to be able to effectively communicate the messages normally displayed on its Billboards, the City Council of High Point, on June 5, 2017, declined to pursue any legislative changes to the City's outdoor advertising regulations.

75.    This trend of allowing modernized Outdoor Advertising Signs is evident from the North Carolina General Assembly's adoption of N.C. Gen. Stat. § 136-131.2 which preempts local regulation of the modernization of existing Billboard locations along the roads and highways falling under the OACA.

76.    As described in more detail below, the City's sign regulations, including the Ordinance, among other things, unconstitutionally prohibit Fairway from erecting new Billboards in areas where the target audiences can be reasonably reached, from erecting Billboards with digital technology, and from replacing or refurbishing existing Billboards throughout the City. In other words, the City's signs regulations, including the Ordinance, are designed to eventually completely eliminate an important and protected form of speech based on the content of such speech.

77.    City redevelopment plans/studies specifically call for the elimination

of Billboards. For example, the Business Interstate 85 study encourages the use of conditional zoning to require that landowners agree to a "no billboard" condition even in areas zoned Heavy Industrial.

78.     The foregoing actions are not meant to be an exhaustive list of the City's treatment of Fairway and its Billboards; rather, they are merely a small representative sample of the City's biased treatment of and hostility towards Fairway and its Billboards over the years.

79.     Upon information and belief, there has been no study or support presented to City Council for High Point demonstrating that Fairway's Billboards, including those using digital technology, have a detrimental impact on public health or safety. This includes the lack of evidence presented to the City that the Billboards cause traffic hazards. In fact, the only evidence presented during any public hearing record before the City Council to consider sign regulatory changes was that Billboards, including those using digital technology, did not present a traffic hazard.

80.     Upon information and belief, there has been no study or support presented to City Council for High Point demonstrating that Fairway's Billboards, including those using digital technology, have a detrimental impact on aesthetics in any manner different than the large volume of signs that are presently allowed within the City in all districts, including along the corridors represented by Highway 311B (North Main Street to South Main Street) and NC 68 (Eastchester Drive).

## FAIRWAYS' PERMIT APPLICATIONS AND DENIALS

81.     On July 27, 2017 with its initial filings and November 27, 2017 with a later set, Fairway filed with the City complete applications for sign permits, totaling nine (9) applications in all.   Since that time, Fairway has withdrawn one (1) application.   Additionally, since the above referenced dismissal of the original complaint, Fairway has lost the lease on one other location.   The remaining seven (7) consist of erecting or reconstructing one (1) new Billboard employing digital technology on each of the 7 Commercial Parcels, including one (1) application, being at 1528 S. Main Street, to replace an existing billboard that used vinyl to one having digital faces.

82.     The 7 Commercial Parcels are zoned for one of the following categories by the City:   General Business (GB); Limited Business (LB); Conditional Use – Retail Center (CU RC); or Main Street -Sub Area C (MS-C).

83.     The City's Ordinance provides, in part, the intent of the GB district:

> The GB district is established to accommodate a wide range of general retail, business, and service uses that serve groups of neighborhoods. GB districts are generally located at major street intersections and along major thoroughfares.

> *See* [Ordinance § 3.4.6, Ex. C].

84.     The GB district permits, either as of right or by special use permit, a wide range of commercial, institutional and industrial uses, including, without

limitation, cemeteries, governmental facilities, day care centers, medical care facilities, bus stations, communication or broadcasting facilities, wireless telecommunication facilities, bars or nightclubs, restaurants, offices, parking garages, tattoo parlors, auto repair shops, sports gyms, gas station/convenience stores, pawnshops, shopping malls, major retail sales, flea markets, malls, auto dealerships, hotels, self-storage, warehouse and distribution, and microbreweries.

85.     The intent of the LB district is as follows:

The LB district is established to primarily accommodate low to moderate intensity office, retail and personal service adjacent to and within residential neighborhoods.  In addition to commercial uses, the district also allows a variety of residential and institutional uses in stand-alone structures as well as in mixed use developments.

*See* [Ordinance § 3.4.5, Ex. C].

86.     The LB district permits, either as of right or by special use permit, a wide range of commercial and institutional uses, including, without limitation, governmental facilities, day care centers, offices, auto repair, gas stations, and major retail sales.

87.     The intent of the Retail Center (RC) district is stated, in part, as follows:

The RC district is intended to accommodate a diverse range of high-intensity retail, service, and office uses that provide goods and services serving the residents and businesses of the region.  The district is typically located at major intersections where visibility and good access are important.  Development in the RC district is often configured as large-scale development with multiple uses, shared parking, coordinated signage, landscaping, and deep front setbacks.

*See* [Ordinance § 3.4.7, Ex. C].

88.     The RC is a more intensive commercial district than GB.

89.     The intent of the Main Street district is as follows:

The Main Street (MS) district is established to encourage compact, walkable, pedestrian-oriented, mixed-use development and redevelopment along Main Street.  It is intended to enhance the range of goods and services available to shoppers in the Core City while also providing a wider range of urban housing options for those seeking to live near the central business district.

*See* [Ordinance § 3.5.6, Ex. C].

90.     The Main Street district permits a wide range of uses, including, without limitation, day care centers, bus stations, colleges or universities, bars or nightclubs, restaurants, offices, parking garages, auto repair, sports gyms, gas station/convenience stores, flea markets, pawnshops, major retail sales, auto dealerships, hotels, and microbreweries.   It is an area containing a mixture of retail and service type uses which are primarily auto oriented.

91.     The GB, LB, RC and MS Districts are hereinafter referred to collectively as the "Commercial Zones".

92.     The 7 Commercial Parcels are currently surrounded by intense commercial or nonresidential developments.

93.     Upon information and belief, the only internal memoranda or communication from the City's Planning Staff to the City Council related to the regulation of Outdoor Advertising Signs prior to the Ordinance is attached hereto

and incorporated herein by reference.  *See* Ex. D.

94.    On August 18, 2017 and December 15, 2017, as part of the enforcement of the Ordinance, the City's code enforcement officer (and thus the City) ("Zoning Administrator") denied every one of Fairway's permit applications, including the ones for the 7 Commercial Parcels, citing to three (3) sections of the Ordinance as the basis for denial: Section 5.7.11A, [Ex. C], which purports to restrict Outdoor Advertising Signs only to Heavy Industrial districts; Section 5.7.11E.2(a), [Ex. C], which purports to establish a 300 foot separation from billboards to a residential district or a lot containing a religious institution; and Section 8.5.5A, [Ex. C], which prohibits the replacement of an existing nonconforming sign. True and correct copies of the Zoning Administrator's denial letters are attached hereto and incorporated herein by reference. *See* Ex. E.  Where appropriate herein, the Zoning Administrator's denial letters shall be referred to collectively as the "Denials."

95.    The First Amendment does not authorize such an onerous regulation on a critical  means of communication as represented by the Denials' enforcement of the Ordinance. *See, e.g., E & J Equities, LLC v. Board of Adjustment of the Township of Franklin*, 146 A.3d 623, 643-44 (N.J. 2016) (onerous regulations on digital outdoor advertising signs failed intermediate scrutiny because they were based solely on "unsupported suppositions, fears, and concerns").

29

96.     Although not required to, Fairway administratively appealed in a timely manner the Denials to the City of High Point Board of Adjustment ("BOA").  The BOA ruled that it had no jurisdiction over the claims raised by Fairway.  On April 26, 2018, the BOA issued its decision to Fairway, denying jurisdiction.

97.     After the original Complaint was filed as noted above in the Background section, the City amended its signs regulations on or about February 4, 2019 (the "2019 Amendment") to admittedly attempt to address legal deficiencies in the City's Ordinance under applicable State and federal law, many of which were identified in Fairway's original complaint.  As part of the public hearing record before City Council regarding the 2019 Amendment, Fairway (now doing business as Lamar Outdoor) presented its objections in writing, a true and accurate copy of which (without attachments) is attached hereto and incorporated herein by reference. *See* Ex. F.  The 2019 Amendment attempting to cure defects in the Ordinance are not enforceable or applicable to Fairway's challenge to its Permit Denials as a result of N.C.G.S. §143-755(a) or are otherwise unconstitutional for the reasons stated in Counts I, II, III, IV, V, VI and VIII.

## COUNT I

### FACIAL CHALLENGE TO THE CONSTITUTIONALITY OF THE ORDINANCE AS A CONTENT-BASED RESTRICTION ON SPEECH; ALTERNATIVELY, IT FAILS UNDER CENTRAL HUDSON

98.     Fairway incorporates by reference Paragraphs 1 through 97 of this

Complaint as if each Paragraph was set forth herein in its entirety.

99. The Ordinance, on its face, defines "Off-Site Sign" or "Outdoor Advertising Sign (Billboard)" according to the content of the message and/or what type of information the message conveys, as follows: "A sign which directs attention to a business, commodity, service, entertainment, or attraction sold, offered, or existing elsewhere than upon the lot where the sign is displayed." [Ordinance § 10.4] (defining terms).

100. The Ordinance, on its face, also regulates and enforces standards against an "Off-Site Sign" or "Outdoor Advertising Sign (Billboard)" based on the content of the message and the intent of the speaker because, among other things, most of such signs are deemed to be nonconforming under the Ordinance and are also subject to extremely strict size, height, location, setback, and spacing regulations. No other types of signs or messages are similarly restricted in the Ordinance; therefore, "Off-Site Signs" or "Outdoor Advertising Signs (Billboards)" are discriminated against and treated differently than other types of signs or messages under the Ordinance based on the content of the message and/or what type of information the message conveys.

101. The Ordinance regulates within the City's zoning jurisdiction the use of a property for a "sign" and broadly defines such use in Section 10.4 to include those signs displaying commercial or noncommercial messages. A "sign" is defined as

31

follows:

> An object, device, display, or structure, or part thereof, which is used to advertise, identify, display, direct, or attract attention to an object, person, institution, organization, business, produce, service, event, or location by any means, including but not limited to words, letters, pennants, banners, emblems, trademarks, trade names, insignias, numerals, figures, design, symbol, fixtures, colors, illumination, or projected images or any other attention directing device.

> [Ordinance § 10.4].

102. On its face, the term "sign" in the Ordinance is content-based since it regulates according to the content of the message and/or what type of information the message conveys, to wit: "attracting attention to an object, person, institution, organization, business, produce, service, event, or location" and by the content and viewpoint-based exemptions in Section 5.7.7, more specifically delineated below. [*Id.*, Ex. A].

103. Section 10.4 of the Ordinance, on its face, defines and regulates "Construction Sign" according to the content of the message and/or what type of information the message conveys, to wit: "A sign which identifies the architects, engineers, contractors, and other individuals or firms involved with construction of development, the name of the building or development, the intended purpose of the building or development, and/or the expected completion date."

104. Section 10.4 of the Ordinance, on its face, defines and regulates "Governmental Sign" according to the content of the message and/or what type

of information the message conveys and/or according to the speaker, to wit: "A sign erected by or on behalf of a governmental body to post a legal notice, identify public property, convey public information, and direct or regulate pedestrian or vehicular traffic."

105. Section 10.4 of the Ordinance, on its face, defines and regulates "Identification Sign" according to the content of the message and/or what type of information the message conveys.

106. Section 10.4 of the Ordinance, on its face, defines and regulates "Instructional Sign" according to the content of the message and/or what type of information the message conveys.

107. Section 10.4 of the Ordinance, on its face, defines and regulates "Off-Site Directional Sign" according to the content of the message and/or what type of information the message conveys.

108. Section 10.4 of the Ordinance, on its face, defines and regulates "On-Site Sign" according to the content of the message and/or what type of information the message conveys, to wit: "A sign which directs attention to a business, commodity, service, entertainment, or attraction sold, offered, or existing on the same lot where the sign is displayed; provided, an on-site sign may also display a noncommercial message."

109. Section 10.4's allowance in the Ordinance for noncommercial

messages on an "on-site sign" is not carried over or made applicable to an "off-site sign" or any other type of sign, which means that the Ordinance discriminates against the display of certain noncommercial messages in favor of others.

110.   Section 10.4 of the Ordinance, on its face, defines and regulates "Real Estate Sign" according to the content of the message and/or what type of information the  message conveys.

111.   Section 10.4 of the Ordinance, on its face, defines and regulates "Special Promotion Sign"  according to the content of the message and/or what type of information the message conveys.

112.   Section 10.4 of the Ordinance, on its face, defines and regulates "Temporary Off-Site Sign" according to the content of the message and/or what type of information the  message conveys.

113.   Section 10.4 of the Ordinance, on its face, defines and regulates "Warning Sign" according to the content of the message and/or what type of information the  message conveys.

114.   Section 10.4 of the Ordinance, on its face, defines and regulates "Commercial Message" according to the content of the message and/or what type of information the   message conveys, to wit: "A sign wording, logo, or other representation that, directly or indirectly, names, advertises, or calls attention to a business, product, service, or other commercial activity."

34

115. In Section 5.7 of the Ordinance, on its face, the City imposes different regulatory standards and burdens for signs, including height, size and duration of display, according to the content of the message and/or what type of information the message conveys and/or type of speaker. For example, only speakers communicating messages customarily associated with on-premises businesses can have digital technology to convey information to the public.

116. Section 5.7.7 of the Ordinance, on its face, sets forth signs that are exempt from the regulatory burdens associated with the Ordinance that are applicable to off-site signs or Billboards and other signs. The Ordinance offers no reason for applying its sign regulations to some types of signs but not others. These exemptions in the Ordinance are content based, discriminate on the basis of the signs' messages, are not narrowly tailored to serve a recognized and identified government interest, and reasonable alternative channels of communication do not exist to disseminate the information that Fairway (and those similarly situated to Fairway) seeks to distribute. As such, the Ordinance as it relates to these exemptions is unconstitutional on its face.

117. Specifically, in Section 5.7.7A of the Ordinance, a "governmental sign" conveying any information that the City in its discretion determines is "public information" can be one hundred (100) feet tall or larger, two thousand (2,000) square feet in size or larger; it can flash, scroll or be animated; and it can be displayed

in any zoning district.

118.    Specifically, in Section 5.7.7F of the Ordinance, a "sign located on or affixed to an athletic field scoreboard that is not oriented toward the playing field" can be as large or tall as the owner or user desires (commensurate with the size of the "scoreboard"), with digital technology, or with messages that flash, scroll or are animated, and located anywhere in the City, so long as "off-site" messages are not displayed.

119.    Specifically, in Section 5.7.7J of the Ordinance, a flag of the United States, North Carolina, local government, foreign nation having diplomatic relations with the U.S., or any other flag *adopted or sanctioned* by the City's governing body can be displayed anywhere in the City without regard to how big it is or how tall so long as the content falls within the above-described content-based criteria. (emphasis added).

120.    For all signs exempted in Section 5.7.7 of the Ordinance or its sign regulation due to the content of the message displayed, they can be as large and as tall as the owner or user desires, employ digital messages, or with messages that flash, scroll, or are animated, and located anywhere within the City, even residential areas.

121.    Section 5.7.8 of the Ordinance or its sign regulations, on its face, sets forth signs that are granted exceptions from the requirement of obtaining a sign

36

permit. The Ordinance offers no reason for granting permitting exceptions to some types of signs but not others. These exceptions in the Ordinance are content based, discriminate on the basis of the signs' messages, are not narrowly tailored to serve a recognized and identified government interest, and reasonable alternative channels of communication do not exist to disseminate the information that Fairway (and those similarly situated to Fairway) seeks to distribute. As such, the Ordinance as it relates to these exceptions is unconstitutional on its face.

122. Section 5.7.11E(2)(a) of the Ordinance creates an additional regulatory burden for only Outdoor Advertising Signs (Billboards), purporting to require them to be separated from a residential district or a lot containing a religious institution by 300 feet or more ("Residential/Church Spacing Standard"). This is a content-based restriction since, in order to implement said restriction, the message that the sign conveys must be examined by the local government enforcement officer.

123. There is no justification for the Residential/Church Spacing Standard grounded in secondary effects that are attributable or unique to Outdoor Advertising Signs (Billboards). As an example of the arbitrary standard, the Residential/Church Spacing Standard does not tie its restriction to visibility of the sign from the lot from which the distance is measured that would remotely support any claim (albeit erroneous) related to aesthetics or safety.

124. On its face, the Ordinance creates different regulatory standards or

burdens for signs seeking to display noncommercial messages. For example, an owner of a Billboard by its definition cannot display off-site noncommercial speech, even though it can display commercial speech on the same size sign. On its face, the Ordinance prefers some noncommercial signs over others by the differential treatment given, including outright exemption or varying standards on height, size and duration of display. In this regard, the Ordinance is content-based and not narrowly tailored to serve a recognized and identified government interest, and reasonable alternative channels of communication do not exist to disseminate the information that Fairway (and those similarly situated to Fairway) seeks to distribute. As such, the Ordinance as it relates to these restrictions is unconstitutional on its face.

125. On its face, the Ordinance gives preferential treatment to, and imposes different regulatory burdens on, signs displaying commercial speech such as real estate signs from signs that would display noncommercial speech, which is a content-based distinction in conflict with the United States Supreme Court decision in *Metromedia v. The City of San Diego*, 453 U.S. 490, 101 S. Ct. 2882 (1981).

126. On its face, the Ordinance gives preferential treatment to, and imposes different regulatory burdens associated with, on-site signs versus off-site signs or Billboards, a content-based distinction in conflict with the United States Supreme

Court decision in *Reed*, *supra*.

127. On its face, the Ordinance gives preferential treatment to, and imposes different regulatory burdens associated with, signs displaying certain types of noncommercial speech versus Billboards displaying either commercial speech or noncommercial speech, a content-based distinction in conflict with the United States Supreme Court decision in *Reed*, *supra*, and *City of Cincinnati v. Discovery Network, Inc*., 507 U.S. 410, 113 S. Ct. 1505 (1993).

128. There is no stated or justifiable reason in the Ordinance for the City's content-based disparate treatment, severe restriction, or strict regulation of Outdoor Advertising Signs.

129. There is no stated or justifiable reason in the Ordinance for the City's content-based disparate treatment, severe restriction, or strict regulation of "signs containing commercial  messages."

130. There is no stated or justifiable reason in the Ordinance for the City's content-based preferential treatment or relaxed regulation of the types of signs identified in the above paragraphs of this Complaint.

131. The content-based distinctions, restrictions, and/or regulations on speech, enumerated above are presumptively unconstitutional, subject to strict scrutiny, and may only be  upheld if narrowly tailored to serve a compelling government interest.

132.   On their face, the content-based distinctions, restrictions, and/or regulations described above are not narrowly tailored to  serve a compelling government interest.

133.   On its face, the Ordinance is not a valid time, place, or manner regulation of  constitutionally protected speech. *City of Cincinnati*, *supra*.

134.   By making content-based distinctions, restrictions, and/or regulations on speech  throughout the Ordinance, the City has violated the North Carolina Constitution, including but not  limited to, Article I, § 14.  Article I, § 14 protects all speech equally and does not distinguish between or accord different levels of scrutiny to noncommercial speech when compared to commercial speech.

135.   By making content-based distinctions, restrictions, and/or regulations on speech  throughout the Ordinance, the City has violated the United States Constitution, including but not  limited to, the First and Fourteenth Amendments.

136.   In Section 5.7.1, the City sets forth the purpose and intent of its sign regulations as follows:

> The purpose of this section is to support and complement the various commercial and nonresidential uses through regulations concerning the placement, number, location, size, appearance, illumination, and animation of signs.  The erection of signs is controlled and regulated in order to promote the health, safety, welfare, convenience, and enjoyment of travel on streets.  The provisions of this section are more specifically intended to:
>
> a.   Promote the reasonable, orderly, and effective display of signs, displays and devices;

b.    Protect the public welfare as well as land values by preserving the aesthetic qualities of the city's environment;

c.    Preserve the city's environment from excessive and obtrusive signs;

d.    Promote the safety of persons and land by providing that signs do not create traffic hazards or hazards due to collapse, fire, collision, decay, or abandonment;

e.    Promote the efficient transfer of general public and commercial identification or information, and maintain a viable business community throughout the year by improving the legibility and effectiveness of signs; and

f.    Enhance the image, appearance, and economic vitality of the city.

137.   Upon information and belief, there are no studies that show a reasonable, casual connection between the goals stated in Section 5.7.1 of the Ordinance or sign regulations and the regulation of Outdoor Advertising Signs within the City, including, without limitation, whether or not they cause traffic hazards or whether or not they depress land values or otherwise violate the public health, safety, welfare, convenience and enjoyment of travel on street. Moreover, there are no studies that justify the discriminatory treatment imposed on Outdoor Advertising Signs compared to exempted signs or signs not requiring a permit or other signs that are allowed in the Commercial Zones.

138.   There are less restrictive alternatives that would address the City's stated goals in Section 5.7.1 that would not effectively ban Outdoor Advertising Signs, including those deploying digital technology.

139. Alternatively, if the Ordinance is content-neutral in the various applications referenced above, then in the context of signs like Fairway's that display both commercial and noncommercial messages, it does not further a substantial government interest, is not narrowly tailored to further that interest, and does not leave open ample alternative channels of communication. As a result, the Ordinance violates intermediate scrutiny under *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 100 S. Ct. 2343 (1980) and *Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 109 S. Ct. 3028 (1989).

140. While the 2019 Amendment purported to amend certain of the provisions referenced in this Count I, it either left other provisions intact or deleted outright Outdoor Advertising Sign use for publishing off-premises messaging as a permitted use of land anywhere in the City, while allowing other signs based on content, which on its face is unconstitutionally defective.

141. As a proximate result of the unlawful and unconstitutional actions of the City as set forth above, Fairway has been directly and adversely affected, and is entitled to declaratory and injunctive relief against the enforcement of the Ordinance (and the 2019 Amendment, especially in regard to the 7 Commercial Parcels under N.C.G.S. §143-755(a)) and damages as hereinafter set forth.

## COUNT II

## REGULATION OF TOO MUCH PROTECTED SPEECH

142.    Fairway incorporates by reference Paragraphs 1 through 141 of this Complaint as if each Paragraph was set forth herein in its entirety.

143.    Outdoor Advertising Signs, especially those that employ digital technology, are uniquely valuable or important modes of communication. The City's sign regulations, including the Ordinance and the 2019 Amendment, effectively forecloses or bans this entire medium of expression in the City.

144.    In today's world, it is common for people, including those traveling within the City, to engage in speech through digital technology to communicate real-time messages.

145.    The City's sign regulations, including the Ordinance and the 2019 Amendment, does not provide any practical alternatives to the signs Fairway requested to be erected or reconstructed on the 7 Commercial Parcels, especially for real-time messaging associated with commercial or noncommercial advertisers seeking to rent space on those signs to display such messages.    The quantity and accessibility of speech uniquely displayed on the 7 requested digital signs is substantially diminished by the City's sign regulations, including the Ordinance and the 2019 Amendment, without an adequate justification or a showing of secondary effects differentiating them from other signs regulated based on the content-based distinctions described above or without support for significant regulatory distinctions even if content-neutral.

146. The 7 Commercial Parcels and the streets that they are located along are natural and proper places for the dissemination of information and opinions that Fairway's signs display and the City's sign regulations, including the Ordinance and the 2019 Amendment, goes too far in effectively banning them in these areas where the targeted audience is not likely to be reached and without satisfactory alternatives or substitutes.

147. The Ordinance goes too far in regulating protected speech and violates the First Amendment to the United States Constitution. *City of Ladue v. Gilleo*, 512 U.S. 43, 114 S. Ct. 2038 (1994). In doing so, it also violates Article I, § 14 of the North Carolina Constitution.

148. As a proximate result of the unlawful and unconstitutional actions of the City as set forth above, Fairway has been directly and adversely affected, and is entitled to declaratory and injunctive relief against the enforcement of the City's sign regulations, including the Ordinance and the 2019 Amendment (especially in regard to the 7 Commercial Parcels under N.C.G.S. §143-755(a)), and damages as hereinafter set forth.

## COUNT III

### FACIAL VAGUENESS/PROCEDURAL DUE PROCESS AND OVERBREADTH CHALLENGE TO THE CONSTITUTIONALITY OF THE ORDINANCE

149. Fairway incorporates by reference Paragraphs 1 through 148 of this

Complaint as if each Paragraph was set forth herein in its entirety.

150.   Section 10.4 of the City's Ordinance (and 2019 Amendment) defines "Commercial Message" as: "A sign wording, logo, or other representation that, directly or indirectly, names, advertises, or calls attention to a business, product, service, or other commercial activity." By definition, the Zoning Administrator must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether a message "**directly or indirectly . . . calls attention to**" the items listed, in order to determine whether a message qualifies as a "Commercial Message".

151.   The Ordinance (and 2019 Amendment) leaves the meaning of "Noncommercial Message" undefined. As a result, the Zoning Administrator must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether a message qualifies as a "Noncommercial Message".

152.   Section 2.3.10 of the Ordinance (and 2019 Amendment) provides: "Unless expressly stated otherwise . . . . a condition of approval shall be limited to those deemed necessary to ensure compliance with the review standards for the particular type of application, or to prevent or minimize adverse effects from the proposed development on surrounding lands. They shall be related in both type and amount to the anticipated impacts of the proposed development on the public and the

45

surrounding development." By definition, the Zoning Administrator must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding "**the minimum adverse effects" requirement** to interpret and apply this provision of the Ordinance.

153. The City's sign regulations, including Ordinance and 2019 Amendment, affords the Zoning Administrator with a purported right to request additional information for any sign permit application. By definition, the Zoning Administrator must form a **subjective** personal opinion, exercise judgment, or otherwise perform a **subjective** or **ad hoc** determination regarding whether an application for a permit is in the correct **form** or contains the correct or adequate **content** to interpret and apply these provisions of the Ordinance. *See*, *e.g.*, *Nittany Outdoor Advertising, LLC v. College Township*, 22 F. Supp. 3d 392, 412 (M.D. Pa. 2014) (the township's "power to hold a permit hostage for ransom" in the form of demands for information not specified in the Code "'effectively vests . . . officials with unbridled discretion'" (quoting *Solantic, LLC v City of Neptune Beach*, 410 F.3d 1250, 1272 (11th Cir. 2005))); *Public Citizen, Inc. v. Pinellas County*, 321 F. Supp. 2d 1275, 1292-93 (M.D. Fla. 2004) (holding that an "ordinance that grants the decisionmaker authority to request 'any additional information' confers 'unconstitutional discretion … because it presumes that [the decisionmaker] ... will use her blanket authority to request additional information only in good faith

and consistent with implicit standards'" (quoting *American Target Advertising, Inc. v. Giani*, 199 F.3d 1241, n.3, 1252 (10th Cir. 2000) (alterations in original))). In addition, ordinances that utilize the word "may" have routinely been invalidated as unconstitutional.

154. On its face, the sections of the City's sign regulations, including Ordinance and 2019 Amendment, that lack any time period under which the City and/or Zoning Administrator must act on a permit application confer on the City and/or the Zoning Administrator unstructured, unlimited, and/or unbridled discretion to determine when to so act.

155. By being vague, ambiguous, and/or overbroad, the City sign regulations, including Ordinance and 2019 Amendment, violate the North Carolina Constitution, including but not limited to Article I, §§ 14 and 19.

156. By being vague, ambiguous, and/or overbroad, the City's sign regulations, including Ordinance and 2019 Amendment, violate the United States Constitution, including but not limited to the First and Fourteenth Amendments.

157. By being vague, ambiguous, and/or overbroad, the City's sign regulations, including Ordinance and 2019 Amendment, violate Fairways' (and those similarly situated to Fairway) civil rights.

158. As a proximate result of the unlawful and unconstitutional actions of the City as set forth above, Fairway has been directly and adversely affected, and is

47

entitled to declaratory and injunctive relief against the enforcement of the Ordinance and the 2019 Amendment (especially in regard to the 7 Commercial Parcels under N.C.G.S. 143-755(a)), and damages as hereinafter set forth.

## COUNT IV

## FACIAL CHALLENGE TO THE CONSTITUTIONALITY OF THE ORDINANCE AS A PRIOR RESTRAINT

159.   Fairway incorporates by reference Paragraphs 1 through 158 of this Complaint as if each Paragraph was set forth herein in its entirety.

160.   Sections 2.3.4, 2.3.5, 2.3.10, 2.3.12, 2.4.2 and 2.5.13 of the City's sign regulations, including Ordinance, contain several provisions that attempt to explain how and when one needs to obtain a permit or license with respect to a sign or a message such as those proposed to be displayed on Billboards.

161.   The City's sign regulations, including Ordinance, fail to set forth content-neutral criteria—such as narrow, objective, and definite standards—to ensure that the City's and/or the Zoning Administrator's permitting, licensing, or revocation decisions are not based on the content or viewpoint of the speech or message.

162.   The City's sign regulations, including Ordinance, fail to create a permitting or licensing scheme that reduces the City and/or Zoning Administrator's act of granting, denying, or revoking a permit or license to a ministerial one, without the exercise of judgment or the formation of an opinion

48

by the City and/or Zoning Administrator.

163. For example, and not by way of limitation, the City's sign regulations, including Ordinance, lack all of the following:

      a.      Clearly defined—*i.e.*, not vague or overbroad—terms;

      b.      Any clearly defined limits on the time within which the decision-maker must issue a permit or license;

      c.      Any clearly defined limits on the time within which the decision-maker must deny a permit or license;

      d.      Any guarantee of prompt judicial review of a decision denying or revoking a permit or license; and/or

      e.      Any requirement that the status quo be maintained during any period of review.

164. The City's sign regulations, including Ordinance, lack any procedural safeguards or neutral criteria of any type with respect to permitting or licensing.

165. The City's sign regulations, including Ordinance, do not provide an avenue by which an "Off-Site Sign (Billboard)" may obtain a variance from a strict application of the Ordinance.

166. Variance procedures such as those in Section 2.4.15 of the Ordinance that are discretionary and subjective in nature and foreclose the ability of an "Offsite Sign (Billboard)" to obtain a variance of any type, are a form of prior restraint and unconstitutional. *See*, *e.g.*, *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1362 (11th Cir. 1999) (variance criteria that empowered zoning board to covertly discriminate against speech activity under the

guise of general "compatibility" or "environmental" considerations unconstitutional); *see also*, *Desert Outdoor Advertising, Inc. v. City of Moreno Valley*, 103 F.3d 814, 818-19 (9th Cir. 1996); *Lamar Advertising Co. v. City of Douglasville*, 254 F. Supp. 2d 1321, 1329 (N.D. Ga. 2003).

167. As an unconstitutional prior restraint, the City's sign regulations, including Ordinance, violate the North Carolina Constitution, including but not limited to, Article I, § 14.

168. As an unconstitutional prior restraint, the City's sign regulations, including Ordinance, violate the United States Constitution, including but not limited to, the First and Fourteenth Amendments.

169. As an unconstitutional prior restraint, the City's sign regulations, including Ordinance, arbitrarily deprive, and/or attempt to deprive, Fairway (and those similarly situated to Fairway) of its vested property rights.

170. As an unconstitutional prior restraint, the City's sign regulations, including Ordinance, are arbitrary, capricious, and/or unfounded; and otherwise results in the arbitrary deprivation of Fairway's (and those similarly situated to Fairway) vested property rights/interests without due process of law.

171. As an unconstitutional prior restraint, the City's sign regulations, including Ordinance, violate Fairway's (and those similarly situated to Fairway) civil rights.

172.  As a proximate result of the unlawful and unconstitutional actions of the City as set forth above, Fairway has been directly and adversely affected, and is entitled to declaratory and injunctive relief against the enforcement of the Ordinance and the 2019 Amendment (especially in regard to the 7 Commercial Parcels under N.C.G.S. §143-755(a)), and damages as hereinafter set forth.

## COUNT V

### FACIAL CHALLENGE TO THE CONSTITUTIONALITY OF THE ORDINANCE AS A VIOLATION OF EQUAL PROTECTION AND/OR SUBSTANTIVE DUE PROCESS

173.  Fairway incorporates by reference Paragraphs 1 through 172 of this Complaint as if each Paragraph was set forth herein in its entirety.

174.  On its face, the City's sign regulations, including Ordinance, make content-based distinctions as defined above.

175.  The facially disparate treatment of "Outdoor Advertising Signs" and signs containing commercial messages under the City's sign regulations, including Ordinance, violates the North Carolina Constitution, including, but not limited to, Article I, § 14 and §19.

176.  The facially disparate treatment of "Outdoor Advertising Signs" and signs containing commercial messages under the City's sign regulations, including Ordinance, violate the United States Constitution, including but not limited to the Equal Protection Clause of the Fourteenth Amendment.

51

177.   The facially disparate treatment of "Outdoor Advertising Signs" and signs containing commercial messages under the City's sign regulations, including Ordinance, are arbitrary, capricious, and/or unfounded; and otherwise results in the arbitrary deprivation of Fairway's (and those similarly situated to Fairway) vested property interests without due process of law.

178.   The facially content-based distinctions, restrictions, and regulations with respect to "Outdoor Advertising Signs" and signs containing commercial messages and all other types of signs or messages under the City's sign regulations, including Ordinance, violate the North Carolina Constitution, including but not limited to Article I, § 14 and §19.

179.   The facially content-based distinctions, restrictions, and regulations with respect to "Outdoor Advertising Signs" and signs containing commercial messages and all other types of signs or messages under the City's sign regulations, including Ordinance, violate the United States Constitution, including but not limited to, the Equal Protection Clause of the Fourteenth Amendment.

180.   The facially content-based distinctions, restrictions, and regulations with respect to "Outdoor Advertising Signs" and signs containing commercial messages and all other types of signs or messages under the City's sign regulations, including Ordinance, are arbitrary, capricious, and/or unfounded; and otherwise result in the arbitrary deprivation of Fairway's (and those similarly situated to

Fairway) vested property interests without due process of law.

181.   As a proximate result of the unlawful and unconstitutional actions of the City as set forth above, Fairway has been directly and adversely affected, and is entitled to declaratory and injunctive relief against the enforcement of the Ordinance and 2019 Amendment (especially in regard to the 7 Commercial Parcels under N.C.G.S. §143-755(a)), and damages as hereinafter set forth.

## COUNT VI

## EXCLUSIONARY ZONING; ULTRA VIRES

182.   Fairway incorporates by reference Paragraphs 1 through 181 of this Complaint as if each Paragraph was set forth herein in its entirety.

183.   The City derives its zoning power from Article 19, Chapter 160A, as amended by Chapter 160D, of the North Carolina General Statutes ("Zoning Enabling Statutes").

184.   The Zoning Enabling Statutes do not authorize the banning of a use except for one that is a nuisance *per se*.  The use of property for outdoor advertising is not a nuisance *per se*.

185.   There is no competent evidence to support the City's sign regulations (including the Ordinance and 2019 Amendment)'s treatment of Outdoor Advertising Signs since they can be controlled and used without material threat to health or safety of the City or its residents.

186. Since the practical effect of the City's sign regulations (including the Ordinance and the 2019 Amendment) are to ban or prohibit Outdoor Advertising Signs displaying off-site commercial or noncommercial messages, including those employing digital technology, it is *ultra vires*, beyond the scope of the Zoning Enabling Statutes, void and of no effect.

187. The practical effect of the City's sign regulations (including Ordinance and 2019 Amendment) to ban or prohibit outdoor advertising within the City denies Fairway of the fruits of its labor under Article I, § 1 of the North Carolina Constitution, deprives it of its property in contravention of the law of the land as guaranteed by Article I, § 19 of the North Carolina Constitution, and is not a valid exercise of the police power of the State. *State v. Ballance*, 229 N.C. 764, 51 S.E.2d 731 (1949).

188. As a proximate result of the unlawful and unconstitutional actions of the City as set forth above, Fairway has been directly and adversely affected, and is entitled to declaratory and injunctive relief against the enforcement of the Ordinance and the 2019 Amendment (especially in regard to the 7 Commercial Parcels under N.C.G.S. §143-755(a)) and damages as hereinafter set forth.

## COUNT VII

**"AS APPLIED" CHALLENGE TO THE CONSTITUTIONALITY OF THE ORDINANCE AND/OR THE DEFENDANT'S ACTIONS WITH RESPECT TO FAIRWAY**

189.   Fairway incorporates by reference Paragraphs 1 through 188 of this Complaint as if  each Paragraph was set forth herein in its entirety.

190.   The City's Denials of Fairway's permit applications for the 7 Commercial Parcels resulted in unlawful enforcement or application of its sign regulations.

191.   As applied to Fairway, the City's actions violated Fairway's free speech rights under the First and Fourteenth Amendments to the United States Constitution and Article I, §§ 1, 14 and 19 of the North Carolina Constitution.

192.   Fairway had a legitimate right to the issuance of the sign permits in question, the Denials of which were unduly confiscatory and violative of the First and Fourteen Amendments to the United States Constitution and Article I, §§ 1, 14 and 19 of the North Carolina Constitution.

193.   Under N.C.G.S. 143-755(a), Fairway has a right to have the illegal provisions of the Ordinance stricken or determined to not be applied to its permit applications related to the 7 Commercial Parcels.

194.   The City's actions are void and of no effect for being unconstitutional as applied to Fairway.

195.   As a proximate result of the unlawful and unconstitutional actions of the City as set forth above, Fairway has been directly and adversely affected, and is entitled to declaratory and injunctive relief against the enforcement of the City's sign

regulations, and damages as hereinafter set forth.

## COUNT VIII

## DAMAGES; TEMPORARY TAKING; INVERSE CONDEMNATION

196.   Fairway incorporates by reference Paragraphs 1 through 195 of this Complaint as if  each Paragraph was set forth herein in its entirety.

197.   The actions of the City complained of above deprived Fairway of its constitutionally protected right to free speech, and in doing so, caused injury or damage to Fairway.

198.   Fairway possessed a reasonable expectation of earning rental revenue from advertisers using the planned digital display Billboards on the 7 Commercial Parcels, such expectation being unlawfully denied as a result of the City's actions described above.   Fairway's profits were lost as a result of the City's unlawful actions, such loss being a direct and necessary result of, or a proximate and natural flow from, the City's wrongful conduct, and such profits are capable of being shown with a reasonable degree of certainty.  But for the City's action, Fairway would have earned substantial revenue from the operation of the digital display billboards reflected in the Denials.

199.   42 U.S.C. § 1988 provides that in the absence of an appropriate remedy under federal law, the federal courts shall look to the laws of the forum state, being North Carolina in the case at hand.  There is not an appropriate remedy under federal

law for damages related to the deprivation of Fairway's constitutional rights as set forth above. North Carolina damages that include an award for lost profits would be consistent with the Constitution and laws of the United States, especially for the purposes of 42 U.S.C. § 1983.

200. Fairway is entitled to have and recover from the City its damages, including its lost profits or lost sales, for the violation of its rights—including but not limited to those rights protected by 42 U.S.C. § 1983 in an amount to be determined at trial or with a dispositive motion.

201. In the event that the City's sign regulations, including the Ordinance and 2019 Amendment, are declared void or otherwise unenforceable against Fairway, Fairway shall be entitled to a declaration that the City has taken its property interests for the period of time of the deprivation under constitutional principles or under inverse condemnation, N.C. Gen. Stat. § 40A-51, and an award of just compensation for the temporary taking.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Fairway, respectfully requests that this Honorable Court:

a. declare that the City's sign regulations (including the Ordinance or portions thereof) violate the North Carolina Constitution, including but not limited to Article I, §§ 1, 14 and 19, and the United States Constitution, including but

not limited to the First and Fourteenth Amendments, on their face by making content-based distinctions, regulations, and restrictions on speech, and are therefore invalid and unenforceable;

b.      declare that the City's sign regulations (including Ordinance or portions thereof) violate the North Carolina Constitution, including but not limited to Article I, § § 1, 14 and 19, and the United States Constitution, including but not limited to the First and Fourteenth Amendments, on their face by being vague, ambiguous, overbroad, and/or a violation of Procedural Due Process, and are therefore invalid and unenforceable;

c.      declare that the City's sign regulations (including Ordinance or portions thereof) violate the North Carolina Constitution, including but not limited to Article I, § § 1, 14 and 19, and the United States Constitution, including but not limited to the First and Fourteenth Amendments, on their face as a prior restraint, and are therefore invalid and unenforceable;

d.      declare that the City's sign regulations (including Ordinance or portions thereof) violate the North Carolina Constitution, including but not limited to Article I, § § 1, 14 and 19, and the United States Constitution, including but not limited to the Equal Protection Clause and Substantive Due Process Clauses, on their face, and are therefore invalid and unenforceable;

e.      declare that the City's sign regulations (including Ordinance (or

portions thereof), and the enforcement thereof, constitute exclusionary zoning, are ultra vires and otherwise are in violation of the North Carolina Constitution, including but not limited to, Article I, § § 1 and 19, on their face, and are therefore invalid and unenforceable;

f.      declare that the City's sign regulations (including Ordinance or portions thereof) violate Fairway's (and those similarly situated to Fairway) civil rights—including but not limited to those rights protected by 42 U.S.C. § 1983—and are therefore invalid and unenforceable;

g.      declare that the manner in which Defendants are interpreting, enforcing and applying the City's sign regulations, including Ordinance, with respect to and against Fairway, violates the North Carolina Constitution and the United States Constitution;

h.      declare that the manner in which Defendants are interpreting, enforcing and applying the City's sign regulations, including Ordinance, with respect to and against Fairway violates Fairway's civil rights—including but not limited to those rights protected by 42 U.S.C. § 1983;

i.      declare that the Denials are null and void;

j.      declare that the Zoning Administrator must issue the sign permits requested and enjoin the City from preventing the erection and operation of the digital signs for the 7 Commercial Parcels;

59

k.    award damages, including lost profits or lost sales, to Fairway for the violation of its rights—including but not limited to  those rights protected by 42 U.S.C. § 1983—as detailed herein;

l.    award Fairway its costs and fees (including reasonable attorney's fees) pursuant to 42 U.S.C. § 1988 and N.C.G.S. §6-21.7; and

m.    grant such further, additional, and/or other relief as this Court may deem equitable,  just, and/or appropriate.

This the 9th day of November, 2021.

/s/ David M. Wilkerson
DAVID M. WILKERSON
NC Bar # 35742
CRAIG D. JUSTUS
NC Bar # 18268
THE VAN WINKLE
LAW FIRM
P.O. Box 7376
Asheville, NC 28802-7376
Telephone: 828-258-2991
Fax: 828-257-2767
dwilkerson@vwlawfirm.com
cjustus@vwlawfirm.com
Attorneys for Plaintiff